IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

MARK BITZAN,

        Petitioner,

vs.

PATTI WACHTENDORF and IOWA
STATE PENITENTIARY,

        Respondents.

No. 18-CV-0031-LRR

**ORDER**

_____

**TABLE OF CONTENTS**

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.    *FACTUAL AND PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . *2*

     A. *Trial and Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
     B. *Direct Appeal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
     C. *Postconviction Relief* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
     D. *Federal Habeas* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

III.   *STANDARDS OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

IV.   *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

V.    *CERTIFICATE OF APPEALABILITY* . . . . . . . . . . . . . . . . . . . . . . . *25*

VI.   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *26*

1

## I.     INTRODUCTION

The matter before the court is Petitioner Mark Bitzan's pro se "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus" ("Petition") (docket no. 1).

## II. FACTUAL AND PROCEDURAL HISTORY

### A.     Trial and Conviction

On June 19, 2011, a trial information was filed in the Iowa District Court for Monona County alleging kidnapping in the first degree (Count 1) in violation of Iowa Code Sections 710.1(3) and 710.2 and sexual abuse in the second degree (Count 2) in violation of Iowa Code Sections 709.3(1) and 901A.2.[1]  *See* Trial Information (docket no. 11-6) at 8.  On July 21, 2011, an amended information was filed, which, among other things, detailed the predicate offense for Count 2 as a 2006 conviction for third degree sexual assault in the Seventh Judicial District of Wyoming, case no. 16720-C.  *See* Amended Trial Information (docket no. 11-6) at 13.  A jury trial was held commencing on January 10, 2012 and ending on January 17, 2012.  *See* Trial Transcript Vol. I (docket no. 11-1) at 1.  Petitioner elected not to testify on his own behalf at trial, and he confirmed during a colloquy with the trial judge that he fully understood the decision.  *See* Trial Transcript Vol. IV (docket no. 11-4) at 41-42.  On January 17, 2012, the jury returned a verdict of guilty on Count 1, kidnapping in the first degree.  *See* Verdict (docket no. 11-6) at 272.  The jury answered a special interrogatory, finding that a dangerous weapon was displayed during the first-degree kidnapping offense.  *See id.*  The jury also found that Petitioner was convicted of a prior offense under Iowa Code Section 902.14 as alleged in Count 2 of the Amended Trial Information.[2]  *See id.* at 275; Judgment and

---

[1]  The amended trial information, which was filed on July 21, 2011, listed Iowa Code Section 902.14 for Count 2, rather than 901A.2.  *See* Amended Trial Information (docket no. 11-6) at 13.

[2]  The Iowa District Court conducted a separate enhancement phase of the jury trial to reach a separate verdict on Count 2.  *See* Trial Transcript Vol. V.

2

Sentence (docket no. 11-6) at 320. On March 16, 2012, Petitioner was sentenced to life in prison. *See* Judgment and Sentence at 321.

### B. Direct Appeal

On direct appeal, the Iowa Court of Appeals thoroughly summarized the trial evidence as follows:

> During the evening of December 17, 2010, Bitzan was inside the women's handicap stall at an interstate restroom when nineteen-year-old Natasha stopped at the rest area and used the restroom. As she stood at the sink and washed her hands, Bitzan exited the stall, walked up behind her, placed one hand over her mouth, placed the other hand around her torso, and kissed the top of her head. After asking her if she was "going to be quiet," Bitzan forced Natasha away from the sink area and into the handicap stall at the back of the restroom. Bitzan reached back and latched the stall door as he pushed her up against the wall. Bitzan stood in front of her, between Natasha and the stall door, and began asking questions in a calm voice, for example, "Where are you going?" "Are you alone?" "Do you have people waiting for you or are people expecting you?"
>
> When Natasha would not tell Bitzan her name and slapped his hands away from the zipper on her hoodie, Bitzan responded by changing his body language, reaching into his pocket, and pulling out a collapsible pocketknife. Natasha then gave a name, and Bitzan put the knife away and asked more questions. When Bitzan reached for her pants and she slapped his hand away, Bitzan displayed "frustration or anger" and stated, "This will just be easier if you cooperate." Natasha asked, "Are you going to hurt me?" Bitzan replied, "Not if you cooperate." Bitzan then asked personal questions, "Are you on birth control?" and "Is this a bad time of the month?" When Natasha hesitated in her response to his questions or to his demands, Bitzan gestured toward the knife in his pocket. At some point, Natasha asked herself, "What can I do to live?"
>
> Bitzan proceeded to remove Natasha's boots, pants, and underwear. Bitzan began touching Natasha's genitals as she begged him to stop. Bitzan ordered Natasha to the floor, and he confirmed that she was not visible from outside the handicap stall. Natasha testified, "so I'm lying in that corner, and I remember him remarking … 'good, you are out of sight,' because he

(docket no. 11-5) at 31-36. The second phase occurred with the original jury but was conducted after the verdict was announced on Count 1. *Id.* at 28.

kind of glanced off to the side to … check under the stalls to see if I would be visible." Bitzan pulled down his pants, raped Natasha, and ejaculated inside her. Bitzan wiped himself off and ordered Natasha to remain in the stall until he left. Natasha waited for a few minutes after she heard the bathroom door close, dressed, and drove away.

Natasha, who was in ROTC at college, called her commanding officer for advice. The officer advised Natasha to go directly to a hospital, and she stayed on the phone while Natasha drove to the hospital. Natasha called her mother, and her parents came to the hospital. The hospital was not equipped to perform a sexual assault exam, so the family went to a nearby hospital where Natasha provided samples for a sexual assault kit. The samples were analyzed by the Iowa DCI laboratory. The DNA in the samples matched Bitzan's profile. Bitzan's DNA was in the data bank as a result of a previous sexual abuse conviction in Wyoming.

*State v. Bitzan*, 837 N.W.2d 679 (Table), 2013 WL 3273813, at *1 (Iowa Ct. App. June 26, 2013).

On direct appeal, Petitioner's primary argument was that the evidence at trial was insufficient to support a finding of kidnapping or use of a dangerous weapon. *See* Appellant's Brief (docket no. 11-7) at 29-54. The Iowa Court of Appeals affirmed Petitioner's conviction for first-degree kidnapping. *See Bitzan*, 2013 WL 3273813, at *5. In reaching its decision, the Iowa Court of Appeals reviewed Iowa precedent on kidnapping and concluded that there was "substantial evidence from which a rational jury could find the period of confinement or the distance of removal exceeded what is normally incident to the commission of a sexual abuse." *Id*. at *3-*4. The Iowa Court of Appeals specifically noted that the victim was moved from the open area of the restroom to a stall, the door was latched, and she was further secluded beside a toilet, thus the risk of detection or interruption was significantly reduced. *Id*. at *4. Petitioner also argued that counsel was ineffective for failing to challenge a sentence enhancement or an action during the enhancement portion of the trial. The Iowa Court of Appeals bypassed the arguments because it concluded that no enhancement was applied to Petitioner's sentence. Petitioner sought further review but was denied. Procedendo issued on September 23, 2013.

4

### C. Postconviction

Petitioner initiated postconviction proceedings on August 15, 2014. Petitioner subsequently retained counsel, who filed multiple amended petitions. *See* docket no. 11-14 at 52-66 (Amended Application for Postconviction Relief), 68-83 (Second Amended Application for Postconviction Relief). Ultimately, Petitioner argued that: (1) trial counsel was ineffective for failing to do a pretrial investigation; (2) trial counsel was ineffective regarding Petitioner's right to testify; (3) trial counsel was ineffective for failing to challenge certain jurors; (4) trial counsel was ineffective for failing to protect confrontation rights; (5) trial counsel was ineffective for failing to file a motion in limine regarding testimony on a possible sexual assault spree; (6) trial counsel was ineffective for failing to object to the in-court identification by the victim; (7) the state committed a *Brady* violation; (8) trial counsel was ineffective for failing to call an expert on victim credibility; (9) trial counsel was ineffective for failing to raise prosecutorial misconduct; (10) trial counsel was ineffective for failing to challenge Nurse Wear's vouching testimony; and (11) trial counsel was ineffective for failing to call a medical expert regarding vaginal tears. *See* Second Amended Postconviction Petition at 68-83.

On August 17 and 18, 2016, the Iowa District Court for Monona County conducted a two-day evidentiary hearing on Bitzan's postconviction relief petition. Postconviction Transcript Vol. I and II (docket nos. 24-1 and 24-2). Bitzan's original trial counsel, Dean Stowers, and Nick Sarcone, both testified at the postconviction hearing. Petitioner also testified on his own behalf for the first time. Counsel testified at the hearing that the theory of the case had been that the sexual encounter was consensual in the rest stop bathroom.

By contrast, Petitioner testified, at the postconviction hearing, that during their representation of him counsel refused to listen to his version of the events. *See* Postconviction Transcript Vol. II (docket no. 24-2) at 11. Petitioner proceeded to testify that he first met the victim at the Sonic restaurant in Sioux Falls, South Dakota, where the two agreed to drive in a caravan. *Id.* at 10-16. About 40 minutes into the drive, the

5

victim pulled off at a rest stop and invited Petitioner into her vehicle where flirting quickly escalated to consensual intercourse in the back seat. *Id.* at 17-21. Petitioner testified that his travel companion and best friend, Louis Hamilton, was in his vehicle right next to the victim's and certainly would have seen the sexual encounter. *Id.* at 24.

> Petitioner further testified that, at trial Mr. Stowers:

> pushed [him] to testify. If we went to court and I testified to what he was telling me, like a story that I had met her and we had sex on the floor in the bathroom, and he gave me some random little details that were close to what her story was in the deposition that he had sent, and he told me that it just needed to be close. It needed to be close to what hers was, and he kept cutting me off when I would try to tell him my information that I was never in Iowa.

*See Id.* at 35-36. Petitioner also stated that he kept trying to tell Mr. Stowers "[i]f anywhere, it would have been north in South Dakota," but "[h]e basically ignored me. He didn't really acknowledge that I said anything." *Id.* at 38. When confronted on cross-examination about Mr. Stowers' notes from attorney client meetings that corroborated the theory of consensual sex at a rest stop, Petitioner stated that such notes would be incorrect and "not what [he] said to them." *Id.* at 55-56. Additionally, when confronted with a postconviction filing wherein Petitioner personally stated that he took a route through Iowa, he said it was probably a typo. *Id.* at 66-67.

Petitioner testified that he had ten to fifteen minutes at trial with his attorneys to discuss whether he would testify. *Id.* at 41. He claimed counsel never prepared him to testify or rehearsed what his testimony would be, and that in the short meeting during trial his counsel suggested he should not testify because he would not make a good witness. *Id.* at 42-43. Petitioner said he felt "horrified" about the way Mr. Stowers was describing the option to testify, and he felt uncomfortable because Mr. Stowers "wanted [him] to testify to something different than the truth, something different than what actually happened." *Id.* at 43. On cross-examination, Petitioner admitted that he said

6

nothing about problems with his choice to testify or counsel until his allocution at sentencing. *Id.* at 64.

Both Mr. Stowers and Mr. Sarcone testified at the postconviction hearing that Petitioner never told them he met the victim at the Sonic in Sioux Falls, South Dakota. *See id.* 87, 92, 115, 210-12. Mr. Stowers testified that much of the preparation for trial and investigation of the case, as well as the trial strategy itself, was based upon Petitioner telling them that the sexual encounter was in Iowa and that it was consensual. *See* Postconviction Transcript Vol. I (docket no. 24-1) at 207.

The postconviction court took the matter under advisement and issued a written decision denying the petition for postconviction relief on all accounts. Petitioner appealed the outcome of his postconviction proceedings and his appeal was denied. Petitioner also applied for further review with the Iowa Supreme Court, but his application only concerned a subset of the issues raised at the postconviction hearing. Specifically, he argued that the district court erred by determining that there was no prejudice from the vouching testimony; the court of appeals erred by failing to consider prejudice of the cumulative errors by trial counsel; and, the court of appeals erred by determining that there was a breach of duty during jury selection but no prejudice. Ultimately, the Iowa Supreme Court denied further review.

### D. Federal Habeas Petition

Petitioner initiated these proceedings by filing a pro se habeas petition on March 26, 2018. *See generally* Petition. Respondent answered the Petition and filed the state court documents in February of 2019. *See* docket nos. 10 and 11. A briefing schedule was set, and numerous discovery motions were addressed. Subsequently, the court appointed counsel to assist Petitioner and a new briefing schedule was established. *See* docket no. 40. On March 3, 2020, counsel filed the Petitioner's Brief (docket no. 44). Petitioner attempted to supplement counsel's brief, but his filing was stricken. *See* docket nos. 46, 49. On April 29, 2020, Respondent timely filed the Respondent's Brief (docket no. 53). On May 15, 2020, counsel for Petitioner filed the Reply Brief (docket no. 56).

7

The case is fully submitted and ready for decision.

### III. STANDARDS OF REVIEW

Even if a claim is exhausted, under Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") this court can only issue habeas corpus relief if the petitioner can show that the Iowa court's decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Woodford v. Visciotti,* 537 U.S. 19, 24-25 (2002) (per curiam). A decision is "contrary to" Supreme Court precedent if: (1) "the state court arrives at a conclusion opposite that reached by [the Supreme Court] on a question of law"; or (2) "the state court confronts a set of facts that are materially indistinguishable from a [decision of the Supreme Court] and [nevertheless] arrives at a [different result]." *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). A decision is an "unreasonable application" of Supreme Court precedent if: (1) "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) "the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*. at 407. A state court decision is not unreasonable simply because this court believes the state court erroneously or incorrectly applied Supreme Court precedent. *Id*. at 411. The error or incorrect application must also be patently unreasonable for this court to issue habeas relief. *Id*.

State court interpretations of the facts are presumed correct on federal habeas review. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden to show by clear and convincing evidence that the state court decision was an unreasonable interpretation of the facts. *Id*.; *Middleton v. Roper,* 455 F.3d 838, 845 (8th Cir. 2006). As is the case with an unreasonable application of Supreme Court precedent, erroneous fact-finding by a state court is not enough to warrant habeas relief. *Weaver v. Bowersox,* 241 F.3d 1024,

1030 (8th Cir. 2001). The petitioner must show that the state court's error was an *unreasonable* interpretation of the facts, not just a mistake. *Id*. Additionally, a state court decision on a matter of state law cannot be reviewed by a federal habeas court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Under Section 2254(e), the court need only hold an evidentiary hearing in limited circumstances. 28 U.S.C. § 2254(e)(2)(A)-(B). An evidentiary hearing is warranted if a claim relies on: (1) a new rule of constitutional law that is retroactive on collateral review and was previously unavailable; or (2) a new factual predicate that could not have been discovered earlier via due diligence. *Id*. Additionally, a hearing may be warranted if the facts presented show by clear and convincing evidence that no reasonable factfinder would have found the petitioner guilty absent a constitutional error. *Id*.

## IV. DISCUSSION

### a. Insufficient evidence

Petitioner argued that the evidence was not sufficient to support the "confinement or removal" element of kidnapping under Iowa law because the use of a bathroom stall versus the main area of the bathroom was not significantly different and the sexual act could have been detected in either location. *See* Petitioner's Brief at 7-8. Respondent counters that the federal habeas standard of review is doubly deferential because this court should only consider whether the Iowa Court of Appeals acted reasonably, rather than whether the court correctly interpreted Iowa law. *See* Respondent's Brief at 12-14. Using that narrow approach, Respondent argues that rational jurors could have concluded that a kidnapping occurred and the Iowa Court of Appeals was reasonable to credit the jury's finding. *Id*. at 14-19. In reply, Petitioner argues that the facts were not sufficient under Iowa precedent to find that there was significant confinement or removal of the victim. Petitioner's Reply (docket no. 56) at 4-7.

A sufficiency of the evidence claim is a claim of factual error. Therefore, the applicable standard that applies is 28 U.S.C. § 2254(d)(2): whether the Iowa Courts' decision "was based on an unreasonable determination of the facts in light of the evidence

9

presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The state court's findings of fact are presumed to be correct. *See Beck v. Bowersox*, 257 F.3d 900, 901 (8th Cir. 2001) (*citing* 28 U.S.C. § 2254(e)(1)). The burden is on the petitioner to rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "All conflicting inferences that arise from the historical facts must be resolved in favor of the prosecution." *Nance v. Norris*, 392 F.3d 284, 290 (8th Cir. 2004). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Under Iowa law "a person commits kidnapping when the person either confines a person or removes a person from one place to another . . . [with the intent to subject] the person to a sexual abuse." Iowa Code section 710.2. "Kidnapping is kidnapping in the first degree when the person kidnapped, as a consequence of the kidnapping, suffers serious injury or is intentionally subjected to torture or sexual abuse." Iowa Code § 710.3. In *State v. Rich,* 305 N.W.2d 739 (1981), the Iowa Supreme Court thoroughly examined the meaning of the "confine or remove" element of kidnapping in conjunction with a sexual assault. *Id.* at 745. The Court concluded that although there is no minimum period of confinement or distance of removal, the action must at least be such that it substantially increases the risk of harm to the victim, significantly lessens the risk of detection, or significantly facilitates escape after the offense. *Id.* In *Rich*, the victim was taken from the main area of a shopping mall to a restroom. The Court emphasized that the restroom was sought out for seclusion, and the victim's hands were bound behind her back, an act of restraint which was not necessary to commit sexual abuse. *Id.* at 745-46. Thus, the Court concluded that actions were taken above and beyond those incidental to accomplishing a sexual abuse.

The Iowa Supreme Court recently reexamined its conceptualization of kidnapping in *Sauser v. State*, 928 N.W.2d 816 (2019). In *Sauser*, the Iowa Supreme Court found

that there was insufficient evidence of kidnapping where a wife pointed a gun at her husband and subsequently shot him because it found there was nothing about pointing the gun that made the crime substantially more heinous than the shooting in and of itself. The Court stressed that precedential cases where the evidence was sufficient for kidnapping included "a series of acts of confinement that made the underlying crime more abominable." *Id.* at 820. "The idea is that the kidnapping must make the defendant's overall actions substantially more dangerous." *Id.* at 819-20.

On direct appeal, the Iowa Court of Appeals found that the evidence presented at trial was sufficient to satisfy the elements of first-degree kidnapping. *See Bitzan*, 2013 WL 3273813, at *4. That legal determination was exclusively under Iowa law as an interpretation of Iowa's kidnapping statute, so the legal determination is not subject to review by this federal habeas court. *See*, *e.g.*, *Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Therefore, the only issue for this court is one of fact—whether the Iowa Court of Appeals made an unreasonable determination based on the facts in the record. The burden lies with Petitioner to demonstrate that the Iowa Court of Appeals made an unreasonable determination based on the facts. As the Iowa Court of Appeals noted, the victim testified that Petitioner forcibly removed her from the main area of a restroom to the privacy of a locked stall and secluded her from view on the floor next to the toilet. Either of these actions made the detection and interruption of the assault less likely. The Iowa Court of Appeals did not make an unreasonable determination based on the facts available, and to date, Petitioner has set forth nothing new to change that holding.

Although Petitioner testified at the postconviction hearing that the sexual encounter took place in the victim's vehicle and with consent, that version of events is too late, and it is rebutted by multiple witnesses. This court reviewed the entirety of the trial transcript and the postconviction transcript—more than 1,500 pages of material. The victim's testimony at trial and at the postconviction hearing appears consistent. Additionally, at

11

the postconviction hearing both of Petitioner's trial attorneys testified that they had never heard of a version of events where the Petitioner and victim met at a Sonic restaurant in South Dakota and proceeded to a rest stop to have consensual sex in her vehicle. They testified that Petitioner consistently told them that he had consensual sex with the victim at a rest stop.

Considering this evidence, Petitioner has presented this court with nothing other than his own self-serving testimony to rebut the presumption that the state court factual findings were correct. The argument that he never previously alleged this version of events because his trial attorneys ignored and intimidated him is implausible. Some potential evidence has become unavailable over time—such as specific cell tower records and potential surveillance camera footage from the Sonic restaurant that is no longer available. But, a key potential source of evidence frequently discussed, but never presented, Louis Hamilton, was available to Petitioner. Indeed, Petitioner alleged that his best friend, Louis Hamilton, was an eyewitness to his interactions with the victim. But that evidence was never presented, and the mere suggestion that Hamilton may possess favorable testimony is not enough to satisfy Petitioner's burden because there is clear evidence, that the Iowa Courts considered, to sustain the sufficiency of the evidence finding. Nothing presented in this Petition suggests that the state courts were unreasonable in interpreting the facts. Accordingly, the Petition must be denied on this ground.

### b. *Vouching*

Petitioner argues that registered nurse Laureen Wear (a defense witness) provided improper vouching testimony to which counsel failed to object, and that testimony caused prejudice by giving the jury an expert opinion on the issue of consent. *See* Petitioner's Brief at 8-11. Respondent contends that trial counsel's actions, even though improper under Iowa law, did not cause prejudice due to other overwhelming evidence available. *See* Respondent's Brief at 20-29. In reply, Petitioner points to *Maurer v. Minn. Dep't of*

*Corr.*, 32 F.3d 1286 (8th Cir. 1994), a case in which the Eighth Circuit found a vouching error to be prejudicial. *See* Petitioner's Reply at 8-11.

Nurse Wear was a defense witness at trial. On cross examination she testified:

> A: She presented because she had been sexually assaulted.
>
> Q: I believe it's your testimony that nothing she did made you doubt that, correct?
>
> A: That is correct.
>
> Q: Nothing about her demeanor?
>
> A: Nothing about her demeanor.
>
> Q: Nothing about what she told you?
>
> A: Nothing about what she told me.

Trial Transcript Vol. IV at 30. On re-cross she testified, "[P]ersonally, I felt as if she was not—she was being honest." *Id.* at 30-31.

The prohibition on vouching testimony is rooted in Iowa law, and this Court will not examine a determination of state law, so to the extent that the Iowa courts found improper vouching—that determination stands. However, this Court will apply the ineffective assistance of counsel framework to the situation to conclude that no prejudice occurred.

*Strickland v. Washington,* 466 U.S. 668, 687 (1984) requires an individual to establish that his counsel's performance was deficient and that the deficiency caused him prejudice. "[T]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith,* 539 U.S. 510, 521 (2003) (*quoting Strickland,* 466 U.S. at 687-88). To show prejudice, an individual must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at

Case 1:18-cv-00031-LRR-KEM   Document 58   Filed 08/27/20   Page 13 of 26

694. The *Strickland* standard is even narrower when a federal court reviews a state court action in the habeas context. The combined standard from Section 2254 and *Strickland* "is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

The parties and the state postconviction court agreed that the testimony of Nurse Wear about the victim's credibility was impermissible but the Respondent insists there was no *Strickland* prejudice. *See Bitzan v. State,* 912 N.W.2d 855 (table) (Iowa Ct. App. 2018). This court agrees that there was no prejudice because there was substantial evidence to support the verdict in this case, including other reliable and valid indicators about the victim's credibility. For example, the trained nurse who ultimately examined the victim testified that many types of behavior are consistent with sexual abuse, *see* Trial Transcript Vol. III (docket no. 11-3) at 27, and the victim's commandant (the first person she called after the abuse) testified about her demeanor, *see id*. at 19-20, 22. The victim's own testimony both at trial and at the state court postconviction hearing were also consistent and jurors had the ability at trial to weigh her demeanor and credibility. Accordingly, the record does not support a finding of prejudice based on the brief "vouching" testimony.

### c. *Ineffective assistance of counsel via pretrial investigation*

Petitioner argues that counsel's pretrial investigation was ineffective in a number of ways, including failure to retain certain lay and expert witnesses or conduct a physical investigation. *See* Petitioner's Brief at 11-13. Respondent opposed the failure to investigate claims as unexhausted at the state level, and without prejudicial effect on the outcome of Petitioner's trial. *See* Respondent's Brief at 29-34. Petitioner does not address this issue in his Reply.

To obtain federal habeas relief, a state prisoner must fully exhaust the claims before the state courts. 28 U.S.C. § 2254(b)(1)(A)-(B). *See also Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (holding that under the AEDPA, a petitioner must exhaust available

state remedies). "In other words, a state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). The exhaustion doctrine "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *Id.* at 845. In Iowa, a prisoner must seek review through the established appellate review process, which includes an application for further review in the Iowa Supreme Court. *See Welch v. Lund*, 616 F.3d 756, 758-59 (8th Cir. 2010) (internal citation omitted) (holding that an Iowa prisoner failed to exhaust his claims in the State court when the prisoner's appeal of the state district court's decision to the Iowa Supreme Court was "deflected to the Iowa Court of Appeals" and the prisoner failed to file for further review in the Iowa Supreme Court).

Respondent argues that many of Petitioner's claims were not fully exhausted at the state level, including this claim. The state court records show that on appeal from the postconviction ruling in the Iowa district court, Petitioner only raised three issues in his application for further review—the improper admission of Nurse Wear's vouching testimony, the cumulative impact of trial counsels' errors and the failure to challenge juror 21 for cause. *See* Application for Further Review (docket no. 11-20). By failing to include any other issues in the application for further review, Petitioner essentially abandoned the issues and failed to complete state exhaustion. *See Welch*, 616 F.3d at 758-59. While this court could decline review of all issues other than the three brought forth for further review to the Iowa Supreme Court, out of an abundance of caution, this court will review all of the claims presented in the Petition.[3]

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Hinton v. Alabama*, 571 U.S.

---

[3] The exhaustion issue will be flagged in this Order wherever Respondent raised it, but this analysis of exhaustion will apply throughout the Order.

263, 274 (2014) (citing *Strickland*, 466 U.S. at 690-91). If an attorney makes an unreasonable or flawed strategic decision based on a misunderstanding or lack of legal knowledge, then his strategic or investigatory decision constitutes deficient performance. *Hinton*, 571 U.S. at 274-75. Stated differently, "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Id.* at 274. In *Hinton*, the Supreme Court found that defense counsel's performance was deficient when he failed to hire a qualified expert because he incorrectly believed he could not seek adequate reimbursement to retain the expert. In *Hinton*, the Supreme Court stressed that counsel's deficiency was about his lack of familiarity with the legal reimbursement avenues for retained experts and had nothing to do with the actual credentials or qualifications of an expert. *Id.* at 274-75. The Eighth Circuit recently echoed *Hinton*, finding in *Mayfield v. United States,* 955 F.3d 707 (8th Cir. 2020), that if counsel gives advice that is wrong, based on a simple misunderstanding of the law, then counsel's performance was deficient. *Id.* at 711 (counsel was deficient in advising defendant to take a plea based on a mistaken belief that a federal sentencing enhancement applied, when the enhancement was plainly inapplicable).

Counsel was not deficient in the pretrial investigation of this case, nor was there prejudice as the result of any shortcomings in the investigation. At the postconviction hearing Mr. Stowers testified about the investigatory steps taken and the strategic decisions made. For example, he testified that he did not ultimately seek to call Hamilton as a witness because Petitioner told him Hamilton was asleep the whole time and knew nothing, and Hamilton told the police that they never traveled through Iowa, when Petitioner insisted that they did. *See* Postconviction Transcript Vol. I at 190-193. "[I] just didn't think he had anything to add whatsoever and probably would have not been helpful at all. He probably would have hurt the case. So that's why he wasn't called, and that's why he wasn't really pursued hotly as somebody to follow up with." *Id.* at 193. Mr. Stowers repeatedly testified that he built his trial strategy around the

information he had from Petitioner—that the sexual encounter was consensual and occurred in Iowa.

At the postconviction hearing Petitioner called an investigator to testify about evidence that could have been recovered, such as cell tower data or video surveillance footage. But the investigator's testimony about what could have been done is speculation in the face of consistent and persuasive testimony by the victim, Mr. Stowers, Dan Dawson (DCI Agent) and others. Mr. Stowers testified that Petitioner told him there was consensual sex at an Iowa rest stop—under this version of events the investigatory decisions were sound. There was no reason to pull cell tower records to pinpoint the location, or to secure camera footage from a Sonic restaurant where Petitioner never previously alleged he had gone. There was also no reason to talk to a witness who was allegedly asleep and unaware of the evening's events. Trial counsel did not make strategic decisions based on erroneous interpretations of the law. Counsel made strategic decisions based on the version of events his client relayed to him. The decisions were not unreasonable in light of the available evidence. Accordingly, the court concludes that there was no investigatory error sufficient to rise to the level of ineffective assistance of counsel.

### d. **Brady** *violation*

Petitioner alleges that the police or the state did not disclose the DVD recording of Louis Hamilton's interview. *See* Petitioner's Brief at 14. Respondent argues that this issue was not exhausted, and the evidence was not exculpatory, nor did the state hide it from Petitioner. See Respondent's Brief at 34-37. Petitioner does not address this issue in his Reply.

A *Brady* claim has three essential components: (1) the excluded evidence was favorable to the accused; (2) the evidence was willfully or inadvertently suppressed; and (3) prejudice ensued. *Banks v. Dretke*, 540 U.S.668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "[T]he materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such

a different light as to undermine confidence in the verdict." *Banks,* 540 U.S. at 699 (*citing Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Petitioner's claim fails to meet the materiality standard because it is not plausible that testimony from Hamilton, who was asleep for the majority of the pertinent time period, would put the case in a different light. Additionally, defense counsel knew of the existence of this witness, and knew he had been interviewed, so the Hamilton interview cannot be said to be truly suppressed. *See* Postconviction Transcript Vol. II at 226-227 (Stowers testified that he got the law enforcement report from the Hamilton interview and determined that Hamilton could not provide useful information). The facts presented do not meet the standards of a *Brady* claim, so this court will not grant relief on this theory.

### e. *Failure to strike jurors*

Petitioner argues that his counsel was ineffective because jurors who knew the Monona County Attorney and local law enforcement were not stricken from the jury. *See* Petitioner's Brief at 14. Respondent counters that Iowa courts reasonably concluded that only one juror could have been challenged for cause under state law, and the presence of that juror did not prejudice Petitioner. *See* Respondent's Brief at 36-39. Petitioner does not address this issue in his Reply.

Counsel cannot be ineffective for failing to raise an issue at trial that would have failed under state law. *See Rainer v. Kelley*, 865 F.3d 1035, 1045 (8th Cir. 2017) (*citing Dodge v. Robinson*, 625 F.3d 1014, 1019 (8th Cir. 2010). In *Rainer*, the Eighth Circuit concluded that trial counsel was not ineffective for failing to renew a pretrial objection to the exclusion of evidence because the evidence was properly excluded under Arkansas evidentiary rules. *Id*.

The Iowa Court of Appeals considered the jury selection issues and noted that under Iowa Rule of Criminal Procedure 2.18(5)(e) a potential juror can be challenged for cause if there is an attorney-client relationship at play. *See Bitzan v. State*, 912 N.W.2d 855 (Table), 2018 WL 348092, at *1, *5 (Iowa Ct. App. 2018). Juror 21 testified that

18

the Monona County Attorney was representing him in restaurant litigation, but that he could remain fair and impartial. *See* Trial Transcript Vol. I at 15. At jury selection, the presiding judge stated on the record that the Monona County Attorney played no role in the prosecution of the case. *Id.* Based on this testimony, the Court of Appeals noted that defense counsel should have moved to strike the juror for cause. However, the Court of Appeals concluded that there was no prejudice because counsel and the Petitioner's handwritten notes indicated that they wanted the juror, and the juror stated he could be impartial. *Bitzan*, 2018 WL 348092, at *6.

Here, the juror selection issues were strategic and also fell within the scope of Iowa law. The Iowa Court of Appeals specifically referenced Iowa Rule of Criminal Procedure 2.18(5)(e) and stated that a challenge under the rule would have been the correct course of action for juror 21. The Iowa courts determination about the scope of Rule 2.18(5)(e), is not a determination that this Court will review because it was the state court's interpretation of its own laws and rules. *Estelle*, 502 U.S. at 67-68. However, this Court can still review the jury selection issue under the ineffective assistance of counsel rubric. Petitioner cannot establish prejudice because the record clearly demonstrates that juror 21 stated under oath that he could be fair and impartial, and defense counsel did not object to the selection of this juror. *See* Trial Transcript Vol. I at 15. Even if the juror had a personal relationship with the county attorney, the county attorney was not involved in Petitioner's trial, so the risk of prejudice was entirely speculative.

### f.     *Ineffective assistance regarding Bitzan's right to testify*

Petitioner alleges that counsel were ineffective because they failed to prepare him to testify, improperly advised him regarding testifying and encouraged him to commit perjury. *See* Petitioner's Brief at 14-15. Respondent argues that Petitioner did not exhaust this claim, and even if he did, the trial and postconviction records show that he made an adequate and informed decision about his testimony, the outcome of which was

not prejudicial. *See* Respondent's Brief at 39-42. Petitioner does not address this issue in his Reply.

A defendant has a constitutional right to testify, and only the defendant may waive that right. *See Rock v. Arkansas*, 483 U.S. 44 (1987); *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987). A defendant's waiver of his right to testify, like his waiver of other constitutional rights, must be made voluntarily and knowingly. *Id.* (*citing Boykin v. Alabama*, 395 U.S. 238, 242–43 (1969); *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938)). Although the defendant has the ultimate decision whether to waive his right to testify, he must act affirmatively to assert that right. *Id.* If, during trial, a defendant sits idly and does not express his desire to testify, a knowing and voluntary waiver is deemed to have occurred. *Frey v. Schuetzle*, 151 F.3d 893, 898 (8th Cir.1998); *United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir.1995).

Trial counsel's strategic decisions, however, about who to call to testify are virtually unchallengeable. *See e.g. United States v. Orr*, 636 F.3d 944, 955 (8th Cir. 2011). For example, the *Orr* Court concluded that counsel made appropriate strategic decisions by advising his client (the defendant) not to testify to shield him from cross examination. *Id.* In *Orr*, the defendant's testimony likely would have been an attempt to cause confusion about his place of residence or role in drug-dealing, despite abundant evidence against him. *Id.* Additionally, in *Frey* the Eighth Circuit concluded that counsel can advise a defendant not to testify if he reasonably believes based on his professional evaluation of a case that the defendant's testimony would not be beneficial. *Frey*, 151 F.3d at 899.

Petitioner cannot reasonably allege that he received ineffective assistance of counsel regarding his right to testify, because at trial, Petitioner stated under oath that he understood the final decision was his own, and that he did not wish to testify. *See* Trial Transcript Vol. IV at 41-42. At the postconviction hearing, counsel testified that they had prepared Petitioner to testify, but that they had some concerns about his testimony being consistent with initial information he had told them about the case. Postconviction

Transcript Vol. I at 204-210. Mr. Stowers testified, "[I]n anticipation of him testifying the following day, we were going over him one more time his testimony and kind of going through a mock Q and A with him and asking him to describe what happened, what happened next, this kind of thing. And I'll never forget it, we're in there and he changed his story." *Id.* at 205. "And we said, well, wait a minute, that's not what you told us earlier. And I'm sitting there with Nick. And he says, well—then he said—he says, what do you want me to say? Which threw up a whole bunch of flags. . . ." *Id.* at 206. "And then we said, well, look, Mark, this can't be—we're not telling you what to say. It's got to be what you're saying has really happened. . . . It can't be a story that we're feeding you. We're not doing that." *Id.* at 208. To the extent that this interaction caused counsel to worry about the credibility of their client, they acted within reasonable bounds by admonishing Petitioner about the importance of telling the truth on the stand. And, even if, they advised him not to testify based on related credibility or believability concerns, they did not go beyond the bounds of reasonable counsel in so doing. *See*, *e.g.*, *Frey*, 151 F.3d at 899 (counsel can advise a defendant not to testify if he believes the testimony would not be beneficial).

Based on a review of the Petitioner's statements about testifying at trial, as well as the postconviction testimony of all parties, nothing supports the allegation that counsel was ineffective regarding Petitioner's right to testify. Counsel admonished Petitioner about the need to testify truthfully, but Petitioner was not told that he would be unable to testify. To establish ineffective assistance, Petitioner would have to show that his counsel was deficient regarding his right to testify and that prejudice resulted. *Strickland*, 466 U.S. at 687. Petitioner has not established either prong of *Strickland*. Although counsel may have discouraged him from testifying if there was a concern about his truthfulness, this does not amount to interference with Petitioner's ability to making a knowing and intelligent decision about testifying. Even if counsel improperly influenced Petitioner's decision, which this Court does not believe, he has not established prejudice. The record reveals an individual who changed his story over time and wants a new trial to present

21

an entirely new series of events. In light of consistent testimony by other participants, this Court finds that Petitioner was not prevented from testifying or telling his story because of ineffective assistance of counsel. Therefore, this court denies relief on this claim.

### g. *Confrontation regarding DCI lab report*

Petitioner argues, in his pro se Amended Petition (docket no. 4-1), that his trial was flawed because the lab report matching his DNA to the DNA located on the victim was admitted at trial without affording him the chance to confront multiple witnesses on the issue of his identification. *See* Pro Se Amended Petition at 36-38. Petitioner's counsel elected not to elaborate on this claim. Respondent contends that this issue was not exhausted, and trial counsel had no reason to press the issue because the defense was that the sexual encounter was consensual. *See* Respondent's Brief at 42-43.

The state postconviction review of this claim characterized it as a claim of ineffective assistance of counsel. There was no ineffectiveness because counsel adopted a strategy of claiming consensual sex based on the information provided by Petitioner, and if the theory was that the sex was consensual, then there would be no reason to challenge the authenticity of the lab report. Additionally, even if the report was challenged, the state had adequate witnesses to authenticate the lab report and they would have been presented at trial and thus available for confrontation. Therefore, counsel was not ineffective for the lack of cross examination, nor was there prejudice.

### h. *Ineffective assistance for failing to object to Dawson's testimony*

Petitioner argues in his pro se Amended Petition that his counsel was ineffective for failing to object to DCI Agent Dawson's testimony about a possible serial rapist on the local interstate.[4] *See* Amended Petition at 38-39. Respondent counters that Petitioner

---

[4] Petitioner's appointed counsel did not elaborate on this issue in her brief, instead deferring to the argument presented by Petitioner in his original filing. *See* Petitioner's Brief at 15.

did not exhaust this claim, and there was no prejudice from this discrete line of testimony taken in light of the whole trial. *See* Respondent's Brief at 44-46.

Although trial counsel could have possibly objected to this testimony, the net impact of a few lines of testimony in the week-long trial was minor, resulting in no prejudice. The state merely asked Agent Dawson why he conducted an additional interview with the victim, to which he responded that he wanted to gain any possible additional information she had about her assailant because there had been another possible rape along I-29 during the same timeframe. *See* Trial Transcript Vol. III at 51. The possibility of multiple rapes by one assailant was never discussed further. This testimony covered less than two pages of more than an 800-page record of testimony. Petitioner cannot demonstrate that such a discrete mention of a serial rape spree was prejudicial to him. Thus, the court must deny relief on this ground.

### i. *Prosecutorial misconduct during closing argument*

Petitioner alleges in his pro se Amended Petition that the prosecution committed misconduct in at least 16 ways, and that the misconduct was most damaging during closing arguments.[5] *See* Amended Petition at 40-44. Respondent argues that the claim was not exhausted and there was no prejudice from remarks made during closing. *See* Respondent's Brief at 46-47.

"[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (*quoting Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal citation omitted)). In *Darden*, the Supreme Court stated that a prosecutor's remarks can be undesirable or even universally condemned without fatally infecting a conviction. 477 U.S. at 182. For example, if a prosecutor does not manipulate or misstate the evidence, or mock the defendant for

---

[5] Petitioner's appointed counsel did not elaborate on this issue in her brief, instead deferring to the argument presented by Petitioner in his original filing. *See* Petitioner's Brief at 15.

exercising the right to remain silent, but rather makes commentary that is simply responsive to the defense, then there is no fundamental unfairness. *Id.* at 181-83.

A full review of the closing arguments does not reveal pervasive prosecutorial misconduct. The trial transcript of closing arguments shows that the prosecutor talked about two subjects that were contested by counsel before or during trial, but the issues were not objected to during the prosecutor's closing argument. First, she reminded the jurors that Nurse Laureen Wear testified that she personally believed the victim's claim of sexual assault. Trial Transcript Vol. V (docket no. 11-5) at 11. Second, during her rebuttal closing she mentioned the victim's vaginal tear—an issue that was addressed before trial outside the presence of the jury. *Id.* at 22. These two statements may have cast the Petitioner in a bad light, but they did not misstate the evidence. The prosecutor's closing was largely focused on the legal elements of the offenses, and the burden of proof. In addition to the two statements, she also made an analogy to child sex abuse cases where there is often no other witness than the victim. The Iowa Courts considered that statement on postconviction review and concluded that it did not constitute misconduct. This court agrees with the postconviction assessment that the analogy was not misconduct, and additionally concludes that no other statements during the closing argument constituted significant prosecutorial misconduct. Therefore, regardless of exhaustion Petitioner has not demonstrated misconduct that warrants habeas relief.

### j.  *Cumulative error*

Petitioner argues that taken together, all of the errors his counsel made at trial amount to a showing of prejudice. *See* Amended Petition at 52-65. Petitioner's appointed counsel acknowledged that the Eighth Circuit does not recognize such a theory of cumulative harm. *See* Petitioner's Brief at 15-16 n. 1. Respondent agrees that the cumulative effect of attorney errors does not provide grounds for habeas relief in the Eighth Circuit. *See* Respondent's Brief at 47-48.

"Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for relief." *Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir. 1996).

24

Cumulative error review is not recognized by the Eighth Circuit, and this court has expressly declined to blaze a trail on this legal theory. *See*, *e.g.*, *Johnson v. United States*, 860 F.Supp.2d 663, 749-776 (N.D. Iowa 2012) (thorough discussion of the history and precedent on cumulative error review and cumulative prejudice review). Therefore, as Petitioner's counsel and Respondent acknowledged, the Petition must be denied on this claim because this theory is not supported by controlling precedent.

## V. CERTIFICATE OF APPEALABILTY

"In a habeas corpus proceeding … before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held." 28 U.S.C. § 2253(a). "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. . . ." *Id*. § 2253(c)(1). A district court possesses the authority to issue certificates of appealability under 28 U.S.C. § 2253(c) and Federal Rule of Criminal Procedure 22(b). *See Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may only issue if a petitioner "has made a substantial showing of the denial of a constitutional right." *See Miller–El v. Cockrell*, 537 U.S. 322, 335–36 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076–77 (8th Cir. 2000); *Carter v. Hopkins*, 151 F.3d 872, 873–74 (8th Cir. 1998); *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997); *Tiedeman*, 122 F.3d at 522. To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *Cox*, 133 F.3d at 569 (*citing Flieger v. Delo,* 16 F.3d 878, 882–83 (1994)); *see also Miller–El*, 537 U.S. at 335–36 (reiterating standard).

Courts reject constitutional claims either on the merits or on procedural grounds. "'[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy [28 U.S.C.] § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller–El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). When a federal habeas petition is dismissed

on procedural grounds without reaching the underlying constitutional claim, "the [petitioner must show], at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Having thoroughly reviewed the record in this case, the court finds that the Petitioner failed to make the requisite "substantial showing" with respect to the claims that he raised in his application for a writ of habeas corpus. *See* 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b). Because there is no debatable question as to the resolution of this case, an appeal is not warranted. Accordingly, the court shall not issue a certificate of appealability pursuant to 28 U.S.C. § 2253.

If the Petitioner desires further review of his claims, he may request issuance of the certificate of appealability by a circuit judge of the Eighth Circuit Court of Appeals in accordance with *Tiedeman*, 122 F.3d at 520–22.

## VI. CONCLUSION

In light of the foregoing, it is hereby **ORDERED**:

(1) The Petitioner's Application for a writ of habeas corpus under 28 U.S.C. § 2254 (docket no. 1) is **DENIED**.

 (2) A certificate of appealability shall **NOT ISSUE**.

**IT IS SO ORDERED**.

**DATED** this 27th day of August, 2020.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

26